and concluding that based upon the results of that investigation—information which Keyser was aware of at the time of his plea—Keyser would not have rejected the plea agreement offered to him. Keyser's final assignment of error is without merit.

## CONCLUSION

The order of the district court denying Keyser's motion for postconviction relief is affirmed.

AFFIRMED.

CONNOLLY and McCORMACK, JJ., participating on briefs.

————————————

STATE OF NEBRASKA, APPELLEE, V.
DE'ARIS R. TRICE, APPELLANT.
___ N.W.2d ___

Filed July 5, 2013.    No. S-12-126.

1. **Appeal and Error.** An appellate court may, at its option, notice plain error.
2. **Trial: Appeal and Error.** In determining plain error, where the law at the time of trial was settled and clearly contrary to the law at the time of appeal, it is enough that an error be "plain" at the time of appellate consideration.
3. **Criminal Law: Time: Appeal and Error.** A new criminal rule—one that constitutes a clear break with the past—applies retroactively to all cases pending on direct review or not yet final, and not just to the defendant in the case announcing the new rule.
4. **Homicide: Words and Phrases.** A "sudden quarrel" is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control. It does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim.
5. **Homicide: Intent.** In determining whether a killing constitutes murder or sudden quarrel manslaughter, the question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment.
6. **Criminal Law: Words and Phrases.** Generally speaking, a fight between the victim and a third party is not a "sudden quarrel" as to the defendant.
7. **Appeal and Error: Words and Phrases.** Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of the litigant and is of such a nature that to leave it

uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

8. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial if the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

Appeal from the District Court for Madison County: James G. Kube, Judge. Reversed and remanded for a new trial.

Patrick P. Carney and Ryan J. Stover, of Carney Law, P.C., for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ., and Moore, Judge.

Connolly, J.

A jury convicted De'Aris R. Trice of second degree murder. Before submitting the case to the jury, the district court gave the jury a step instruction regarding second degree murder and manslaughter. Although the instruction was correct when it was given,[1] our subsequent holding in *State v. Smith*[2] rendered the instruction an incorrect statement of the law. Because *Smith* applies retroactively to this case, and because there is evidence—though slight—upon which a jury could conclude that the killing was intentional but provoked by a sudden quarrel, and therefore constituted manslaughter, we find plain error. We reverse.

## BACKGROUND

### The Morning of the Stabbing

At about 1:40 a.m. on December 26, 2010, police officers responded to a call at a house in Norfolk, Nebraska. A police

---

[1] See *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994), *overruled, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998), and *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011).

[2] *Smith, supra* note 1.

dispatcher initially reported a possible stabbing, and later upgraded it to an actual stabbing and possible gun involvement. Officers arrived within a few minutes of the call.

The scene was chaotic. There had been an after-hours party at the house. The house was relatively small, there were many people and cars in the street, and people were trying to leave the area. One individual told an officer that a person had been stabbed, but she did not know who did it. That officer jogged up to the house, looking for anybody with a knife or gun, to try and secure the scene. But the officer saw a group of people around a man, later identified as Timothy Warren, lying on the ground, and the officer stopped to render aid. A woman was already trying to help Warren. The officer opened Warren's airway, confirmed that he was still breathing, and took a look at the wound; it was about a 2-inch puncture wound on the right side of his abdomen. The officer radioed for emergency medical assistance.

Other officers arrived. One officer left to get a CPR mask, while the officer who initially stopped to help Warren left to secure the scene. The officer left Warren with the woman who had initially cared for him; she had told the officer that she had training in CPR and was a nursing and medical assistant. So the officer, with another officer, approached the house. From outside the front door, the officers saw an "extremely agitated" male, with "clenched fists, shaking his arms, [who] had blood on him," and a woman standing in front of him trying to hold him back. The officers entered the house, with one officer "bear hug[ging]" the man, later identified as Rickey Jordan, and attempting to calm him down. Jordan was yelling at two individuals in the house, later identified as Trice and his brother.

The other officer began talking to Trice and his brother. The officer told them to stop and stay where they were; Trice immediately stopped what he was doing, but his brother became angry. Trice attempted to calm his brother down, and the officer asked Trice's brother whether he had stabbed someone. Trice's brother responded incompletely, muttering "something to the effect of 'with a knife.'" The officer later described the statement, not as an admission, but as "something that he

— like he didn't complete his thought when he said it." At that point, Trice's brother calmed down.

The officer then left to help with Jordan, who was still struggling. The officers placed Jordan in handcuffs. Other people at the party told the officers that they had the "wrong guy," and they released Jordan later that morning. Meanwhile, Trice and his brother had left the party. The paramedics had also arrived and transported Warren to the hospital. There, doctors discovered that the stab wound had caused significant internal damage and that Warren was bleeding heavily into his abdomen. The doctors performed surgery to try and repair the damage, but they were unsuccessful, and Warren died.

### The Investigation, Trial, and Sentencing

The police secured and processed the crime scene that same morning and collected and preserved possible evidence of the crime, including photographs, swabs of blood, and several knives. Each of the knives was a regular kitchen knife with one exception—there was also a decorative knife, later identified as belonging to Trice. During the investigation, the police sent several items to the Nebraska State Patrol crime laboratory to be tested for DNA and to determine if the DNA matched any individuals at the party. Notably, the police sent in Trice's knife, the alleged murder weapon, to be tested for Warren's DNA, but the results were inconclusive. Police also interviewed many people at the party. Eventually, the investigation focused on Trice as a suspect. By that time, he had returned to his hometown of Chicago, Illinois. When he found out that the police were looking for him, he voluntarily turned himself in and returned to Nebraska.

At trial, much of the testimony came from people at the party. That testimony revealed that the people living at the house had been at a club which closed at 1 a.m. After the club closed, they invited people to their house for an after-hours party, and, although the invitation list was initially small, a "few people turned into a lot."

Stories of exactly what happened at the party varied from witness to witness. The record indicates that at some point, Warren got into a verbal altercation in the living room with

Kevin Bardwell. Warren threw a punch at Bardwell, starting a fight between them, and other people got involved. During that fight, someone stabbed Warren. The majority of the people at the party testified that they did not see who stabbed Warren. Several witnesses testified that Trice was at the party and in the living room, but the testimony about what Trice did and where he was during the fight differed. Jordan and another witness, however, testified that they saw Trice stab Warren during the fight.

Testimony also revealed that after Warren had been stabbed, Jordan became enraged. At some point, Trice allegedly cut Jordan on the arm. Jordan grabbed some knives from the kitchen and went after Trice, who locked himself in the bathroom. Jordan was yelling that Trice had stabbed his friend and that he was going to kill Trice. About that time, the police arrived and detained Jordan. Trice and his brother then left the party with his brother's girlfriend and her mother. Testimony indicated that on the ride home, Trice's brother repeatedly asked him if he had done "'it'" or "'this.'" Trice's brother testified that eventually Trice said, "'Yeah, I — I had to, I had to protect you and me.'" His brother's girlfriend testified that Trice said that "he cut somebody, but he didn't kill nobody," and her mother testified that Trice said, "'Yeah, I stabbed him in the leg, but I did not kill him.'"

The court instructed the jury. Notably, the court gave a then-correct step instruction regarding second degree murder and manslaughter. The instruction told the jury that it should find Trice guilty of second degree murder if the State proved beyond a reasonable doubt that he had intentionally, but without premeditation, killed Warren. The instruction then stated that only if the State failed to prove those elements could the jury then consider whether Trice had committed manslaughter (here, based on a sudden quarrel). The jury found Trice guilty of second degree murder. The court sentenced Trice to a term of 40 years to life in prison.

## ASSIGNMENTS OF ERROR

As will be discussed more fully below, we find plain error. As such, we do not recite Trice's assigned errors, which are

numerous. Nor do we find those alleged errors necessarily likely to recur on remand,[3] so there is no need to discuss them.

## STANDARD OF REVIEW

[1,2] An appellate court may, at its option, notice plain error.[4] In determining plain error, where the law at the time of trial was settled and clearly contrary to the law at the time of appeal, it is enough that an error be "plain" at the time of appellate consideration.[5]

## ANALYSIS

### Step Instruction Regarding Second Degree Murder and Manslaughter

Our decision is guided by *Smith*[6] and our case law applying it. In *Smith*, the district court instructed the jury to convict the defendant if the State proved beyond a reasonable doubt that the defendant had killed intentionally, but without premeditation. The court further instructed the jury that only if the State failed to prove one of those elements could the jury go on to consider whether the defendant had committed manslaughter.[7]

At the time, that instruction was correct because in *State v. Jones*,[8] we had held that an intentional killing could never be sudden quarrel manslaughter. But in *Smith*, we overruled *Jones* and held that "an intentional killing committed without malice upon a 'sudden quarrel,' . . . constitutes the offense of manslaughter."[9] Because of that holding, the jury instruction in *Smith* was no longer a correct statement of the law:

> [T]he step instruction required the jury to convict on second degree murder if it found that [the defendant] killed

---

[3] See, e.g., *State v. Merchant*, 285 Neb. 456, 827 N.W.2d 473 (2013).

[4] See, e.g., *State v. Nadeem*, 284 Neb. 513, 822 N.W.2d 372 (2012).

[5] See, e.g., *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012).

[6] See *Smith, supra* note 1.

[7] See *id*.

[8] See *Jones, supra* note 1.

[9] *Smith, supra* note 1, 282 Neb. at 734, 806 N.W.2d at 394.

[the victim] intentionally, but it did not permit the jury to consider the alternative possibility that the killing was intentional but provoked by a sudden quarrel, and therefore constituted manslaughter.[10]

Although the instruction was error, we found no resulting prejudice. We reasoned that the defendant "was prejudiced by the erroneous jury instruction only if the jury could reasonably have concluded on the evidence presented that his intent to kill was the result of a sudden quarrel."[11] We found insufficient evidence in the record to support that conclusion and concluded the error was harmless.[12]

[3] Here, the jury instruction is, in all material respects, identical to the erroneous jury instruction in *Smith*. Although we decided *Smith* several weeks after the trial and verdict in this case, the new rule in *Smith* still applies here.[13] A new criminal rule—one that constitutes a clear break with the past[14]—applies retroactively to all cases pending on direct review or not yet final, and not just to the defendant in the case announcing the new rule.[15] Concluding otherwise would violate the principle of treating similarly situated defendants the same and would compromise the ideal of evenhanded administration of justice.[16] Because Trice's case was not yet final when *Smith* came out and because the *Smith* rule was clearly a new rule, it applies in this case. So the step instruction given here was error. The question is whether that error prejudiced Trice. The answer depends on whether "the jury could reasonably have concluded on the evidence presented that his intent to kill was the result of a sudden quarrel."[17]

---

[10] *Id.*

[11] *Id.* at 735, 806 N.W.2d at 395.

[12] See *Smith, supra* note 1.

[13] See, e.g., *State v. Watt*, 285 Neb. 647, ___ N.W.2d ___ (2013); *Smith, supra* note 5.

[14] See *Smith, supra* note 5.

[15] See *id.*

[16] See *id.*

[17] See *Smith, supra* note 1, 282 Neb. at 735, 806 N.W.2d at 395.

[4,5] A "sudden quarrel" is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control.[18] It does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim.[19] The question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment.[20]

We note that in defining a "sudden quarrel," in *Smith*, we also stated, "It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason *so that the elements necessary to constitute murder are absent*."[21] This statement was imprecise. Although provocation negates malice,[22] malice is not a statutory element of second degree murder in Nebraska.[23] The above italicized language should not be included in future jury instructions; while such an inclusion is not necessarily prejudicial error, it is error nonetheless and should be avoided.

Here, the record presents an unclear, confusing picture as to exactly what happened at the party. Witnesses' accounts of what happened varied from person to person, including details of the fight; who it involved; and, notably, the actions and whereabouts of Trice during the fight. Although the witnesses' stories differ, there is at least some evidence indicating that Trice might have acted upon a sudden quarrel.

---

[18] *Smith, supra* note 5.

[19] *Id*.

[20] See *id*.

[21] *Smith, supra* note 1, 282 Neb. at 726, 806 N.W.2d at 389 (emphasis supplied).

[22] See *id*.

[23] See *Burlison, supra* note 1.

[6] Although the fight existed mainly between Warren and Bardwell, and generally speaking, a fight between the victim and a third party is not a "sudden quarrel" as to the defendant,[24] various witnesses indicated that the fight involved more than just those two individuals. For example, when asked whether there was "more than one person in there fighting with [Warren]," one witness replied, "Yes . . . I seen about five in the living room at this time." Another witness testified that Warren and Bardwell "[got] to fighting. They [got] to fighting. Everybody pushing everybody, grabbing everybody." Other witnesses testified that they were involved in the fight only to break it up, though whether they actually were trying to break it up was not clear from the record. Additionally, several people were injured during the fight. For example, one witness testified that her friend got hit in the nose and was bleeding. In short, the record shows that a brawl broke out.

Trice's involvement in that brawl is less than clear. Various witnesses placed him at different places in the room, with different levels of involvement. Some said that he was off to the side, along the wall, and was not involved in the fight. But Trice's brother, a witness for the State, testified that he and Trice were trying to stop the fight and that his "little brother [Trice] jumped in the middle." Trice's brother also testified that once Trice was involved in the fight, Warren swung a bottle "over [his] little brother's shoulder," though it's unclear whether this was directed at Bardwell or Trice. Trice's brother also testified that he initially stayed at this party because he "didn't feel that [Trice] was safe," because of some "earlier events" that had happened days before the party. Finally, Trice's brother testified that when he and Trice left, he asked Trice whether he had done "'it,'" to which Trice eventually responded, "'Yeah, I — I had to, I had to protect you and me.'"

We believe, all things considered, that a jury could find that Trice acted upon a sudden quarrel. Certainly, the evidence does

---

[24] See, e.g., *Watt, supra* note 13; *State v. Harris*, 27 Kan. App. 2d 41, 998 P.2d 524 (2000); *State v. Ruscingno*, 217 N.J. Super. 467, 526 A.2d 251 (1987). Cf. *State v. Brown*, 285 Kan. 261, 173 P.3d 612 (2007).

not compel this conclusion; as we have stated, the evidence in this regard is slight. But such a conclusion is at least reasonably inferable. Even the State, at oral argument, seemingly agreed that a manslaughter instruction was "probably properly given," though the State emphasized that the jury, in the State's view, rationally rejected the sudden quarrel premise. The problem, of course, is that under the instructions given (and presumably followed[25]), the jury never actually considered whether Trice acted upon a sudden quarrel.

[7] We therefore find plain error. Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of the litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[26] Here, the jury instruction did not properly instruct the jury regarding the interplay between second degree murder and manslaughter. And because there was evidence—though slight—upon which a jury could have convicted Trice for sudden quarrel manslaughter, that error was prejudicial. We reverse.

## Double Jeopardy

[8] Having found reversible error, we must determine whether the totality of the evidence was sufficient to sustain Trice's conviction. If it was not, then double jeopardy forbids a remand for a new trial.[27] But the Double Jeopardy Clause does not forbid a retrial if the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.[28]

After reviewing the record, we conclude that the evidence at trial was sufficient to support the verdict against Trice. There were two witnesses who testified to seeing him stab Warren, and there were also witnesses who testified that Trice admitted

---

[25] See, e.g., *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010).

[26] *Smith*, *supra* note 5.

[27] See, e.g., *State v. Abram*, 284 Neb. 55, 815 N.W.2d 897 (2012).

[28] See, e.g., *id*.

to stabbing him. We therefore conclude that double jeopardy does not preclude a remand for a new trial and that the State may retry Trice on the second degree murder and manslaughter charges.

## CONCLUSION

We find plain error in the step instruction regarding second degree murder and manslaughter.

REVERSED AND REMANDED FOR A NEW TRIAL.

HEAVICAN, C.J., not participating.