Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/23/2019 09:06 AM CDT

State of Nebraska, appellee, v.
Jeffrey S. Loving, appellant.
___ N.W.2d ___

Filed April 9, 2019.    No. A-18-112.

1. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court.

2. **Jury Instructions: Proof: Appeal and Error.** The appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

3. **Trial: Courts: Homicide: Jury Instructions.** A trial court is required to give an instruction where there is any evidence which could be believed by the trier of fact that the defendant committed manslaughter and not murder.

4. **Homicide: Intent: Words and Phrases.** A "sudden quarrel" is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control; the question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment.

5. **Appeal and Error: Words and Phrases.** Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of the litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

6. **Trial: Judges: Jury Instructions: Appeal and Error.** It is the duty of a trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing

from the jury an essential issue or element in the case are prejudicially erroneous.

7. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial if the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge. Reversed and remanded for a new trial.

Thomas C. Riley, Douglas County Public Defender, and Leslie E. Cavanaugh for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

MOORE, Chief Judge, and PIRTLE and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Jeffrey S. Loving was convicted by a jury of murder in the second degree and use of a deadly weapon to commit a felony. The district court subsequently sentenced Loving to a total of 110 to 130 years' imprisonment. Loving appeals from his convictions here. On appeal, Loving assigns numerous errors, including that the district court erred by incorrectly instructing the jury as to the elements of murder in the second degree. Because we find merit to Loving's assertion that the district court erred in instructing the jury as to the elements of murder in the second degree and because we find such error is not harmless, we reverse Loving's convictions and remand the cause for a new trial.

## BACKGROUND

The State filed an information charging Loving with first degree murder pursuant to Neb. Rev. Stat. § 28-303(1) (Reissue 2016) and with use of a deadly weapon to commit a felony pursuant to Neb. Rev. Stat. § 28-1205(1) (Reissue 2016). The charges against Loving stem from an incident which occurred on July 7, 2016. Evidence adduced at trial revealed that at

5:53 p.m., shots were fired near the intersection of 28th and Laurel Avenues in Omaha, Nebraska. Approximately 3 minutes after the shots were fired, the 911 emergency dispatch service received a telephone call indicating that there was a shooting victim located at a gas station a short distance from 28th and Laurel Avenues.

When police arrived at the gas station, they found Marshall Washington in the front seat of a silver sport utility vehicle (SUV) suffering from a gunshot wound to his right cheek. Washington's injuries were "'not compatible with life.'" He was pronounced dead at a hospital upon his arrival. At the gas station, police also located the driver of the SUV, Theodore Loving. Theodore told police that his nephew, Loving, had shot at the vehicle as a result of a dispute they were having. Theodore claimed that Loving owed him $3,000 for drugs he had purchased. Loving was subsequently arrested and charged with the murder of Washington.

At trial, Loving admitted that he fired the shots at Theodore's SUV, which shots resulted in Washington's death. However, he claimed that he was justified in firing the shots in defense of himself and his family, because he was afraid that Theodore was going to kill him, his sister, and his sister's children.

The State disputed Loving's claim of self-defense. It presented evidence to demonstrate that Loving was angry with, and not afraid of, Theodore on the day of the shooting. The State also presented evidence to show that Loving fired the shots at Theodore's SUV when it was moving away from him and that after the shooting, Loving attempted to change his appearance and avoid arrest.

The State called Theodore to testify. Theodore testified that he lives in California, but occasionally comes to Nebraska to visit family, including Loving and Loving's sister, Dynasti Loving. Theodore explained that his relationship with Loving and Dynasti was "nothing but love" and that he "always went out of [his] way to help them." When Theodore visited Nebraska in 2012 or 2013, he helped supply Loving with a

large quantity of marijuana. Specifically, Theodore testified that on Loving's behalf, he obtained 1 pound of marijuana from his associates in Juarez, Mexico, and 1 pound of marijuana from his "friends in east Oakland." Despite receiving the 2 pounds of marijuana, Loving refused to pay for it. Because of Loving's refusal, Theodore paid $3,000 of his own funds to his associates in Mexico, because "you don't want to mess with the Juarez boys." Theodore's friends from Oakland were never paid.

In May 2016, Theodore returned to Nebraska for a visit. When he arrived in Nebraska, Theodore had a "friendly" conversation with Loving about the debt Loving owed to Theodore's friends in Oakland. Theodore testified that he was not concerned about Loving's repaying the $3,000 he owed to Theodore; rather, he wanted Loving to repay Theodore's friends from Oakland. According to Theodore, Loving told Theodore that he needed a few weeks to obtain the funds to repay his debt. After Theodore's conversation with Loving, he continued to have contact with Loving, including purchasing marijuana from Loving and spending time together at Dynasti's house. Theodore testified that everything was "[f]ine" and "great" between him and Loving through the beginning of July.

In the first few days of July 2016, Theodore's relationship with Loving changed. Theodore testified that he observed Loving to be spending a lot of money "partying," so he brought up again to Loving the drug debt. Testimony from Theodore and Loving and evidence recovered from Loving's cellular telephone indicated that in the first few days of July, Theodore and Loving exchanged numerous text messages and telephone calls regarding Loving's drug debt. Theodore sent Loving a text message telling him he could "at least send $200 towards [his] debt." Loving replied to the message that he did not intend to repay a 3-year-old debt. Loving also told Theodore to stop calling him and threatened to go to Theodore's girlfriend's house where Theodore was staying "to do something" to him. The State presented evidence that around this same time, Loving

sent a text message to Dynasti, stating, "'He talking about he on his way I'm going to smoke him.'"

Theodore testified that based on Loving's behavior, on July 5, 2016, he contacted a friend of his from Oakland named "Mike." Theodore gave this friend Loving's telephone number and told him that Loving lived with Dynasti. Text messages recovered from Theodore's cellular telephone indicate that Theodore also instructed Mike what to say when he telephoned Loving. Theodore also texted Mike at some point asking him if he had called Loving yet. Ultimately, Mike telephoned Loving sometime in early July and left him a voice mail message. On the message, Mike mentioned Theodore's name and threatened violence against Loving, Dynasti, and everyone who lived in Dynasti's house, if Loving did not repay his debt. Specifically, the voice mail message stated as follows:

> Your Uncle Theodore will get that money. I know you are at your sister's house and I will come there if I have to and I will fuck both you all up. I am not going to leave nothing. Do you understand? So you best try to get that money as soon as you can and pass it to your blood or there will be some blood. And that is real ass talk. Now, if you got any sense, you better get my money or else I am going to [indecipherable] everybody in the house at your sister's.

Theodore testified that he learned that Mike had left the message after Dynasti contacted Theodore on July 7 and was upset with him. Theodore then sent a text message to Mike, asking him, "'Why did you say my name?'"

Also on July 7, 2016, Theodore learned through social media that it was the birthday of his childhood friend, Washington, who he had not seen in a number of years. Theodore also learned that Washington was not in good health and was residing at a local nursing home. He went to visit Washington for his birthday. Theodore and Washington left the nursing home after eating dinner there so that Theodore could "show [Washington] a good time on his birthday." From the nursing home, Theodore drove with Washington in the passenger seat

of his SUV to the area of 30th and Crown Point Avenues to obtain marijuana. Dynasti's house is located at the intersection of 28th and Crown Point Avenues. Theodore testified that he was not "particularly heading to Dynasti's" when he left the nursing home.

Theodore testified that when he approached Dynasti's house on Crown Point Avenue, he recognized someone, whose name he did not know, who was parked in front of the house and pulled up next to the person's vehicle to ask him if he had any marijuana to sell. While Theodore was stopped in front of the house, Loving came to the front of the house from the back-yard. Loving told Theodore, "'You better get out of here before something happens. Ya'll weed days over here are over with.'" Theodore then began to drive away from Dynasti's house, tell-ing Loving that he and Washington would just go around the corner to buy marijuana.

Theodore drove around the block, trying to get to a nearby liquor store. He testified that he could not continue east on Crown Point Avenue after leaving Dynasti's house because there was a schoolbus blocking his way. Theodore admitted that this was the first time he had mentioned the schoolbus. When Theodore's SUV was near the intersection of 28th and Laurel Avenues, which is located behind Dynasti's house, Theodore observed Loving running toward him from behind Dynasti's house. At this time, Theodore had slowed his SUV down, but he did not stop. Loving then started shooting a gun toward the SUV. Theodore believed Loving fired four shots. Theodore quickly drove away from the area. He observed that Washington had been shot and "knew it was bad." Theodore testified that he was not heading anywhere in particular and that he ended up at a nearby gas station. He did not call 911 until he reached the gas station because his cellular telephone's "battery was dead." Theodore testified that he did not threaten Loving during their encounter on July 7, 2016. He also testified that he did not have a gun.

During the defense's cross-examination of Theodore, he admitted that although he spoke with numerous officers

immediately after the shooting and had given a deposition prior to trial, he had never before mentioned obtaining marijuana for Loving from people located in Mexico and Oakland and, thus, never mentioned Loving owed the people from Mexico or Oakland any money. Instead, Theodore repeatedly told police that Loving owed him money for marijuana and that Theodore wanted it back. In fact, in Theodore's text messages to Loving from May through July 2016, he never mentioned Loving owing anyone but Theodore money. In a telephone call to his sister while he was in a police interview room, Theodore stated that "'all I want is my money.'" Theodore also told police several times that he went to Dynasti's house on July 7, 2016, in order "'to settle this with Jeffrey.'" Theodore believed that Loving was "dodging" him. Theodore did not mention wanting to buy marijuana for Washington when he initially spoke with police. Theodore told police that he did not even smoke marijuana.

During the defense's cross-examination of Theodore, it presented evidence that prior to Theodore's trial testimony, he had denied knowing anything about Mike or about the threatening message Mike had sent to Loving.

Forensic investigators who inspected Theodore's SUV after the shooting located three bullets on its passenger side. One of the bullets entered through the outside of the front passenger-side door and was located inside that door. A second bullet was located in the top molding of the rear passenger-side door. The third bullet was located on the plastic trim on the bottom of the passenger side between the front and rear doors. The three bullets recovered from Theodore's SUV and the bullet recovered from Washington were all .40-caliber and were all fired from the same gun.

Both the front and rear passenger-side windows of Theodore's SUV were shattered during the shooting. The front passenger-side window was made of clear or greenish-colored glass. Glass matching that window was located on the east side of the intersection of 28th and Laurel Avenues. The rear passenger-side window was made of tinted glass. The glass appeared to

be black in color. Glass matching the rear window was located on Laurel Avenue, a few feet to the west of 28th Avenue. There was no damage to the driver's side of the SUV, the front of the SUV, or the back of the SUV.

Forensic investigators also recovered 12 casings from the area of the shooting. Ten of these casings were found approximately halfway between Crown Point and Laurel Avenues on 28th Avenue. The casings were located near the curb on the east side of the street. The other two casings were located on the northeast corner of 28th and Crown Point Avenues, across the street from Dynasti's house. All of the casings were from .40-caliber bullets and were fired from the same gun; however, two of the casings were a different brand. Although police searched the area thoroughly, they were unable to locate a gun.

The State also presented evidence regarding Loving's actions after the shooting to refute his claim of self-defense and defense of others. The State called Kirk Carter, Loving's friend, to testify. Carter testified that he was at Dynasti's house at the time of the shooting. In fact, Carter was in his vehicle in front of Dynasti's house when Theodore's SUV pulled up next to him. Carter indicated that he did not see who was in the SUV, but he did observe Loving to gesture that the SUV should leave. Carter indicated that the music playing in his vehicle was very loud and that, as a result, he could not hear the exact words exchanged between Loving and the person in the SUV. Carter explained that after the SUV left, he saw Loving move to the side of Dynasti's house and then heard three or four "bangs" from behind Dynasti's house. Loving then got into Carter's vehicle and they drove away. Carter drove Loving to the house of another of Loving's friends. During the drive, Carter testified that he and Loving did not say much. However, Loving did say, "'He played with me.'" Carter and Loving smoked marijuana in Carter's vehicle, and then Carter left Loving at his friend's house.

Later on the night of July 7, 2016, Loving's girlfriend picked up Loving from his friend's house in a vehicle that she

had borrowed from a friend. Apparently, prior to picking up Loving, she had driven to her friend's house in her own vehicle in order to borrow her friend's vehicle so that she could go look for Loving. The State presented evidence to demonstrate that by the time Loving's girlfriend picked up Loving, he had changed his clothes from the clothes he was wearing at the time of the shooting and had cut his hair much shorter than it had been earlier that day.

After Loving's girlfriend picked up Loving, they returned to the area of her friend's home, presumably to return the friend's vehicle. However, when Loving and his girlfriend drove by, they observed a number of police at the house. They attempted to drive away from the house, but were ultimately stopped by the police and Loving was arrested.

After the State rested its case, Loving called Dynasti to testify in his defense. Dynasti essentially agreed with Theodore's testimony that Theodore had a good relationship with her and Loving when Theodore first came to visit in May 2016. Dynasti testified that she saw Theodore "[a]lmost every other day" and that Theodore spent a lot of time with her and her three children. Dynasti also testified that "sometimes" when she was with Theodore, Loving was also present.

Dynasti also agreed with Theodore's testimony that the relationship between Theodore, Loving, and herself changed in July 2016. Dynasti described that Theodore's attitude toward her and Loving changed dramatically around July 1. She testified that Theodore became extremely upset after he observed her and Loving spend a lot of money on a party they were planning for the Fourth of July holiday. Theodore demanded repayment of Loving's drug debt. Dynasti indicated that Theodore and Loving's relationship became so negative, she uninvited Theodore and his girlfriend from the Fourth of July party. She indicated that she rescinded the invitation partly because she was concerned about Theodore's being violent.

Dynasti described the events of July 7, 2016, differently than Theodore, however. On the morning of July 7, Dynasti was at work when Loving and his girlfriend came to see her. Loving

played the voice mail he received from Theodore's friend, Mike, for Dynasti. Upon hearing the voice mail, Dynasti became very upset. She testified that she began to cry and that Loving and his girlfriend also cried. Dynasti described feeling very worried that something may happen to her children and worried that everyone living in her house was going to be killed. Dynasti indicated that in addition to feeling worried and fearful, she also felt very angry and hurt.

Dynasti planned on contacting an acquaintance who was a police officer after she got home from work. In the meantime, however, she forwarded a recording of the voice mail message to Theodore and asked why he would have someone threaten her and her family. Dynasti admitted that she appeared very angry in her text messages to Theodore: "'You little weak faggot-ass bitch. You're going to regret that you ever did that[.] I don't give a fuck about you. . . .'" "'You don't put no fear in my heart . . . .'" Additionally, Dynasti texted Loving's girlfriend: "'I want his bitch-ass to come to my house'" and "'I'll do it my motherfucking-self.'"

After work, Dynasti was at her house with her three children. She testified that Loving and Carter were outside of the house. Dynasti observed Theodore's SUV pull up in front of her house. She heard Loving scream at Theodore, "'Get the fuck out of here.'" Dynasti indicated that Loving appeared to be afraid. He told her to get inside the house, which frightened her. Dynasti heard Theodore yell back at Loving. She testified that Theodore's words caused her to fear for her life and for Loving's life. From inside the house, she observed Theodore drive around the block. It appeared to her that Theodore was going to turn onto 28th Avenue in order to return to her house. She then saw Loving standing in the middle of 28th Avenue and watched him fire three shots toward Theodore's SUV. Dynasti admitted that her testimony was different than what she told the police immediately after the shooting. She testified that she had told no one, including Loving, that she saw and heard the shooting until a few weeks before trial. On the day of the shooting, Dynasti told

police that she did not even hear the gun shots. In addition, she acted surprised when police informed her that Loving was a suspect in the shooting.

Loving also testified in his own defense. Loving testified that he did not owe Theodore any money for a drug debt. In May 2016, Theodore contacted Loving for the first time in years. Loving testified that Theodore did not bring up the drug debt during their conversation. After that telephone call, Loving saw Theodore "[q]uite often" from May through June. Loving indicated that during that time period, Theodore often purchased marijuana from him. Loving testified that in early July, his relationship with Theodore changed. Theodore began discussing the purported drug debt. Loving indicated that Theodore suddenly had a very different attitude toward him and had a threatening demeanor.

Loving testified that on the morning of July 7, 2016, he listened to the voice mail message that had been left on his cellular telephone by Loving's friend, Mike. After hearing the message, Loving felt "panicked," fearful, and hurt. He testified that he believed that the message was essentially a death threat directed at him from Theodore. During his testimony, Loving described what else had occurred on July 7, prior to the shooting. Loving testified that at some point, prior to the shooting, he shaved his head, because he had "messed up" when "lining [his] hair up." He also testified that prior to the shooting, Carter came over to Dynasti's house and they left the house for a few minutes to go buy cigarettes at a nearby gas station. When they returned, they pulled up in front of Dynasti's house and listened to music in the vehicle. Approximately 5 or 10 minutes later, Theodore pulled up in his SUV and stopped next to Carter's vehicle.

Loving testified that when Theodore first stopped his SUV, he was yelling something that Loving could not hear because the music in Carter's vehicle was too loud. When Loving got out of Carter's vehicle, he grabbed Carter's gun and put it in his pocket. Once outside of Carter's vehicle, Loving could hear that Theodore was yelling about the drug debt. Loving testified

that Theodore shouted, "'I want my motherfucking money.'" Loving yelled at Theodore to leave. He then saw Theodore point a gun at him from inside the SUV.

Loving testified that once he saw Theodore with a gun, he yelled at Dynasti to get inside of the house and he went on the side of the house where he was outside of Theodore's vantage point. Loving indicated that once on the side of the house, he continued to walk toward the backyard. Loving testified that he then heard Carter say, "'They're coming back.'" Loving looked up and saw Theodore's SUV on the street behind Dynasti's house. He testified that Theodore was starting to turn north on 28th Avenue so as to return to Dynasti's house. Loving stated that Theodore stopped his SUV at the intersection of 28th and Laurel Avenues and that Loving again observed Theodore point a gun at him from inside the SUV. Loving believed that Theodore planned to kill him, so he pulled Carter's gun out of his pocket and started to shoot at Theodore and his SUV. Loving was unable to recall exactly how many times he shot; however, he did testify that he shot until the gun was out of bullets. He did testify that he did not intend to kill Theodore or Washington, he just wanted to stop Theodore from returning to Dynasti's house.

Loving testified that after the shooting, he intended to turn himself in at the police station. He indicated that before he did so, he wanted to go to his mother's house. He also indicated that he was fearful that police would shoot him if he was arrested somewhere other than the police station. Loving admitted that during recorded telephone calls from jail after his arrest, he repeatedly denied any involvement with the shooting, rather than stating that he shot Theodore in self-defense. In addition, Loving admitted that the first time he ever mentioned that Theodore had a gun on July 7, 2016, was during his trial testimony.

After hearing all the evidence, the jury rendered its verdict. Although Loving was charged with first degree murder, the jury convicted him of second degree murder, pursuant to a step instruction given by the district court. The jury also convicted

Loving of use of a deadly weapon to commit a felony. Loving filed a motion for new trial, which the district court overruled. The court subsequently sentenced Loving to 80 to 90 years' imprisonment on his conviction for second degree murder and 30 to 40 years' imprisonment on his conviction for use of a deadly weapon to commit a felony.

Loving appeals.

## ASSIGNMENTS OF ERROR

On appeal, Loving assigns five errors. He asserts, restated and renumbered, that the district court erred in (1) overruling his objection to "the racial makeup" of the jury; (2) not permitting him to testify about "his fears of fights in jail" to counter the State's evidence that during jailhouse telephone calls, he denied shooting Washington; (3) failing to properly instruct the jury regarding the elements of second degree murder; and (4) imposing excessive sentences. In addition, Loving argues that there was insufficient evidence presented to prove that he did not act in self-defense or defense of others when shooting at Theodore's SUV.

## STANDARD OF REVIEW

[1] Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011).

## ANALYSIS

### Jury Instructions

Contained within the jury instructions in this case was instruction No. 6, which delineated the elements of first degree murder, second degree murder, and intentional manslaughter. This step instruction also explained to the jury the manner in which it was to consider whether Loving had committed each crime. Because instruction No. 6 is so important to our disposition of this case, we quote it in its entirety:

## INSTRUCTION NO. 6

Depending on the evidence, you may return one of several possible verdicts for Count 1 of the Information. You may find the Defendant:

1. Guilty of Murder in the First Degree; or
2. Guilty of Murder in the Second Degree; or
3. Guilty of Intentional Manslaughter; or
4. Not guilty.

### ELEMENTS

### 1. MURDER IN THE FIRST DEGREE

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the Defendant of the crime of Murder in the First Degree under Count 1 of the Information are:

1. That the Defendant on or [about] July 7, 2016, did kill Marshall Washington Jr.;

2. That the Defendant did so in Douglas County, Nebraska;

3. That the Defendant killed Marshall Washington Jr. purposely and with deliberate and premeditated malice; and

4. That the Defendant did not act in self-defense; and

5. The Defendant did not act in defense of another.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements of the crime of Murder in the First Degree.

### 2. MURDER IN THE SECOND DEGREE

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the Defendant of the crime of Murder in the Second Degree under Count 1 of the Information are:

1. That the Defendant on or about July 7, 2016 did kill Marshall Washington, Jr.;

2. That the Defendant did so in Douglas County, Nebraska;

3. That the Defendant did so intentionally, but without premeditation;

4. That the Defendant did not act in self-defense and;

5. The Defendant did not act in defense of another.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements of the crime of Murder in the Second Degree.

3. INTENTIONAL MANSLAUGHTER

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the Defendant of the crime of Intentional Manslaughter under Count 1 are:

1. That the Defendant on or about July 7, 2016 did kill Marshall Washington, Jr.; and

2. That the Defendant did so in Douglas County, Nebraska; and

3. That the Defendant did so intentionally upon a sudden quarrel, without malice; and

4. That the Defendant did not act in self-defense; and

5. That the Defendant did not act in defense of another.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements of the crime of Intentional Manslaughter.

### EFFECT OF FINDINGS

You must separately consider in the following order the crimes of Murder in the First Degree, Murder in the Second Degree, and Intentional Manslaughter.

For the crime of Murder in the First Degree, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find Defendant guilty of Murder in the First Degree and stop.

If, however, you find that the State did not so prove, then you must proceed to consider the next crime on the list, Murder in the Second Degree. You must proceed in this fashion to consider each of the crimes on the list, in the manner described, until you find the Defendant guilty of one of the crimes or find him not guilty of all of them.

Although at trial, neither Loving nor the State objected to the language of instruction No. 6, Loving claims on appeal that the instruction was not a correct statement of the law because it failed to "include as an element of the crime [of murder in the second degree], the necessary language that 'the Defendant did so without provocation of a sudden quarrel.'" Brief for appellant at 30. Loving asserts that as a result of the omission from the elements of murder in the second degree, the jury instruction constituted plain error which was prejudicial to him. In the State's brief on appeal, it "acknowledges" that instruction No. 6 was erroneous because it omitted from the list of elements of murder in the second degree that Loving acted without the provocation of a sudden quarrel. Brief for appellee at 26. In addition, the State conceded during its oral argument that the erroneous jury instruction amounted to plain error. However, the State argues that this error is harmless.

We agree with Loving and with the State that instruction No. 6 was not a correct statement of the law because it omitted a necessary element of murder in the second degree. A similar instruction to instruction No. 6 was given in *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011), wherein Ronald Smith was ultimately convicted of murder in the second degree. On appeal, he argued that the step instruction given by the district court deprived him of due process because it did not allow the jury to consider whether his specific intent to kill was the result of a sudden quarrel. The Nebraska Supreme Court agreed with Smith's contention. The court stated:

[T]he step instruction given in this case was not a correct statement of the law. Specifically, the step instruction required the jury to convict on second degree murder if it found that Smith killed [the victim] intentionally, but it did not permit the jury to consider the alternative possibility that the killing was intentional but provoked by a sudden quarrel, and therefore constituted manslaughter.

*Id.* at 734, 806 N.W.2d at 394.

In this case, as in *State v. Smith, supra*, the jury instructions did not correctly instruct the jury as to the elements of

murder in the second degree, in that the jury was not permitted to consider whether Loving killed Washington as a result of a sudden quarrel. The jury found beyond a reasonable doubt that Loving intentionally killed Washington without premeditation and, as a result, found Loving guilty of murder in the second degree. Instruction No. 6 instructed the jury that if it found Loving guilty of murder in the second degree, it was to stop and not review the elements of intentional manslaughter. Thus, the jury never considered whether Loving killed Washington "upon a sudden quarrel," which could have reduced Loving's conviction to manslaughter.

[2] However, in order for us to reverse based on a defective jury instruction, the evidence must support the inclusion of "upon a sudden quarrel" and the defendant must have been prejudiced by the exclusion of that language. See *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013). The appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id*.

[3] A trial court is required to give an instruction where there is any evidence which could be believed by the trier of fact that the defendant committed manslaughter and not murder. *Id*. In the context of this case, Loving was prejudiced by the erroneous jury instruction only if the jury could have reasonably concluded on the evidence presented that his intent to kill was the result of a sudden quarrel.

[4] A "sudden quarrel" is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control. *State v. Trice*, 286 Neb. 183, 835 N.W.2d 667 (2013). It does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. *Id*. The question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and

reflection, rather than from judgment. *Id*. The test is an objective one. *State v. McGuire, supra*.

In *State v. Trice, supra*, the Supreme Court considered whether there was any evidence that De'Aris Trice's intent to kill was the result of a sudden quarrel. The evidence presented in that case indicated that Trice and his brother had been involved in a "brawl" at an after-hours party. *Id*. at 191, 835 N.W.2d at 673. During that brawl, Trice fatally stabbed the victim. Although witness accounts differed, the evidence suggested that Trice got in the middle of a fight between the victim and a third party. Testimony from Trice's brother indicated that after he and Trice got involved in the fight, the victim swung a bottle in Trice's direction. Trice later told his brother that he stabbed the victim in order to protect the two of them. After analyzing this evidence, the Supreme Court stated, "We believe, all things considered, that a jury could find that Trice acted upon a sudden quarrel. Certainly, the evidence does not compel this conclusion; as we have stated, the evidence in this regard is slight. But such a conclusion is at least reasonably inferable." *Id*. at 191-92, 835 N.W.2d at 673. As a result of the court's finding, it concluded that the court's failure to properly instruct the jury on the elements of murder in the second degree constituted plain error.

In a similar case, *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012), the Supreme Court considered whether there was any evidence of a sudden quarrel when William Smith shot at the victim, who was running away from him. In that case, the evidence revealed that Smith and the victim were involved in an altercation outside of a bar. During that altercation, the victim punched Smith in the face. The victim and his friends then left the scene, and Smith and his friend followed them. When the other group of individuals stopped at a grocery store 5 or 10 minutes later, Smith yelled that he wanted to fight with the victim. At least three or four of the victim's friends joined in the fight. Smith's friend then fired his gun two or three times in the air. As the victim and his friends were running away,

Smith grabbed the gun from his friend and fired in the victim's direction. The Supreme Court found:

> From this evidence, a finder of fact could conclude that Smith was provoked when he was "jumped" by several persons in the parking lot and that as a result of this sudden occurrence, he acted rashly and from passion, without due deliberation and reflection, rather than from judgment. Certainly this conclusion is not compelled by the evidence, but it is at least fairly inferable.

*Id*. at 645, 822 N.W.2d at 409.

However, in *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011), the Supreme Court determined that there was no evidence of a sudden quarrel when Ronald Smith admitted to arguing with the victim and in the course of that argument, pushed the victim off of the bed and then held a pillow over her face for 1 to 2 minutes. The Supreme Court found:

> From this, the jury could reasonably infer that Smith and [the victim] had been arguing and that Smith was angry. But there is no evidence explaining how or by whom the argument was started, its duration, or any specific words which were spoken or actions which were taken before [he] pushed [the victim] to the floor. And most importantly, there is no evidence that [the victim] said or did anything which would have provoked a reasonable person in Smith's position to push her from the bed and smother her with a pillow. In the absence of some provocation, a defendant's anger with the victim is not sufficient to establish the requisite heat of passion. Nor does evidence of a string of prior arguments and a continuing dispute without any indication of some sort of instant incitement constitute a sufficient showing to warrant a voluntary manslaughter instruction.

*Id*. at 735, 806 N.W.2d at 395.

In this case, there was evidence presented at trial which suggested that the shooting of Washington was the result of a continuing dispute between Loving and Theodore. Both Loving

and Theodore testified that in the days preceding the shooting, they had been arguing about a debt that Theodore believed Loving owed to him. Additionally, there was evidence that on the day of the shooting, there was "some sort of instant incitement" in that Loving listened to a voice mail message which, in his mind, was a threat against his life which had been initiated by Theodore. See *id.* at 735, 806 N.W.2d at 395. Loving testified that not more than a few hours after hearing this message, Theodore arrived at the house of Loving's sister, Dynasti; demanded repayment of Loving's debt; and pointed a gun at Loving from inside his SUV. The two engaged in a screaming match after which Loving went around the side of the house to hide from Theodore. Loving testified that Theodore then drove his vehicle around the block and appeared to be turning back toward Dynasti's house. Loving testified that Theodore again pointed a gun at him and that as a result, Loving fired his weapon. Loving's testimony was corroborated in part by Dynasti.

During his testimony, Theodore disputed Loving's account of the events which occurred on the day of the shooting. Specifically, he testified that there was no real argument between Loving and himself on that day. He testified that he went to Dynasti's house in order to purchase marijuana, not to collect on Loving's debt. Theodore also indicated that he did not threaten Loving during their encounter, nor did he ever point a gun at Loving. In fact, Theodore insisted that he did not have a gun at that time. Notably, however, Theodore's testimony appears to be different than the account he gave to the police immediately after the shooting. At that time, Theodore indicated that he had gone to Dynasti's house to collect the debt and that all he wanted was his money back.

Although witness accounts of what occurred on July 7, 2016, differ somewhat, there is evidence in the record which, if believed, indicates that Loving acted upon a sudden quarrel when he fired the shots at Theodore's SUV and killed Washington. A jury could reasonably find that Loving

acted rashly and from passion, without due deliberation and reflection, rather than from judgment, when he fired the shots at Theodore's SUV. As in *State v. Trice*, 286 Neb. 183, 835 N.W.2d 667 (2013), and *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012), this finding is not compelled by the evidence presented at trial, but it is at least plausible. However, the evidence present herein does meet the test of some evidence of a sudden quarrel set out by these cases. Unfortunately, because the district court incorrectly instructed the jury regarding the elements of murder in the second degree, the jury did not have the opportunity to consider whether Loving killed Washington as a result of a sudden quarrel. We therefore find plain error.

[5,6] Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of the litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Trice, supra*. Here, although neither Loving nor the State objected to instruction No. 6 at trial, it is clear that the instruction did not properly instruct the jury regarding the interplay between murder in the second degree and manslaughter. It is the duty of a trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous. *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012). Because there was evidence upon which a jury could have convicted Loving for intentional manslaughter, the district court's error was prejudicial. We reverse Loving's conviction for murder in the second degree. And, because Loving's use of a deadly weapon conviction was predicated on his conviction of an underlying felony, the use of a weapon conviction must also be reversed. See *State v. Wilson*, 247 Neb. 948, 530 N.W.2d 925 (1995), *overruled on*

*other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

## DOUBLE JEOPARDY

[7] Having found reversible error, we must determine whether the totality of the evidence was sufficient to sustain Loving's conviction. If it was not, then double jeopardy forbids a remand for a new trial. See *State v. Trice, supra*. But the Double Jeopardy Clause does not forbid a retrial if the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. *Id*.

After reviewing the record, we conclude that the evidence at trial was sufficient to support the jury's verdict finding Loving guilty of murder in the second degree and use of a deadly weapon to commit a felony. Loving, himself, admitted to firing the shots which ultimately killed Washington. Although Loving testified that he fired the shots in self-defense, based on its verdict, the jury clearly rejected such an assertion. There is evidence to support the jury's determination. The location of broken glass from the two passenger-side windows suggests that Theodore's SUV was moving away from Loving at the time he fired the shots. In addition, Theodore testified that he did not threaten Loving during their encounter on July 7, 2016, nor did he have a gun. There was also evidence which suggested that after the shooting, Loving attempted to change his appearance in order to evade arrest. Based upon this evidence, we conclude that double jeopardy does not preclude a remand of the cause for a new trial and that the State may retry Loving on the second degree murder and manslaughter charges, as well as the use of a deadly weapon to commit a felony charge.

We note that because the jury found Loving guilty of murder in the second degree, it essentially acquitted him on the charge of murder in the first degree. As a result, the State is prohibited from retrying Loving on the charge of first degree murder.

OTHER ASSIGNED ERRORS

Because we are reversing Loving's convictions and remanding the cause for a new trial, we need not address his assertions that the district court erred in overruling his objection to the makeup of the jury or in imposing excessive sentences. During oral argument, defense counsel specifically requested that we review whether the district court erred in prohibiting Loving from testifying, in detail, about why he denied any involvement in Washington's shooting while he was in jail awaiting trial. Defense counsel stated that she believed this issue may recur during a subsequent trial. We have reviewed the argument as to this issue which Loving made in his brief to this court. In addition, we have carefully reviewed Loving's testimony in this regard. Ultimately, we conclude that our record is insufficient to review this issue, because during the trial, defense counsel failed to make an offer of proof as to what Loving would have testified to had the court not sustained the State's objection. Moreover, we note that upon our remand, this issue can be fully examined by the district court prior to a new trial upon the filing of a proper motion in limine.

CONCLUSION

We find plain error in the step instruction given regarding the elements of murder in the second degree and manslaughter. We also find that this error was prejudicial to Loving because it prevented the jury from considering whether Loving killed Washington as a result of a sudden quarrel. We reverse Loving's convictions and remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.