IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE GUARDIANSHIP OF KYOKO R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP OF KYOKO R., A MINOR CHILD.

MARY S. AND MARTIN S., COGUARDIANS AND
COCONSERVATORS, APPELLANTS,

V.

MARCIA S., APPELLEE.

Filed October 15, 2019.    No. A-18-595.

Appeal from the County Court for Douglas County: THOMAS K. HARMON, Judge. Affirmed.

Richard J. Schicker for appellants.

Marcia S., pro se.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Mary S. and Martin S. appeal the order of the Douglas County Court terminating their guardianship of their 15-year-old granddaughter Kyoko R. Mary and Martin (collectively the Guardians) assign nineteen assignments of error which can be summarized into the following major categories: The court erred (1) in its handling of the in camera interview of Kyoko; (2) in failing to include questions submitted to the court by the parties (to be considered by the court in conducting the in camera interview) as part of the transcript or supplemental transcripts; (3) in, sua sponte, taking judicial notice of the pleadings in the case without notice to the parties and providing the parties the opportunity to respond; (4) in creating a record which contains reference to certain

- 1 -

"indiscernible" responses throughout Kyoko's in camera interview; (5) in committing evidentiary errors in connection with the offer of certain exhibits and evidence; and (6) in numerous findings contained in the portion of the court's order entitled "findings of fact and conclusions of law" which resulted in error in its order terminating the guardianship. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

This case involves the Guardians' guardianship of their granddaughter Kyoko, who was born in 2002. Marcia S. and Lawrence R. are Kyoko's biological parents. Although they never married, they resided together and jointly cared for Kyoko until they separated when Kyoko was about 2 years old. Following their separation, Kyoko lived at times with Lawrence, at times with Marcia, and at times with Alma F., who was Lawrence's mother. Marcia, Lawrence, and Alma worked collectively and cooperatively in raising Kyoko. This arrangement was a voluntary arrangement among them and there was no court-ordered separation or legal custody determination. This arrangement lasted until Lawrence's death in October 2013.

Following Lawrence's death, Marcia agreed to allow a despondent Kyoko, then 11 years old, to live with Alma because Kyoko expressed that she preferred to live with Alma because it made her feel closer to Lawrence. Shortly thereafter, in January 2014, Marcia agreed to the appointment of Alma as Kyoko's guardian on a temporary basis due to circumstances in Marcia's life including her pending March 2014 incarceration in Missouri on a fourth-offense driving under the influence (DUI) conviction.

Alma served as Kyoko's guardian until Alma's own incarceration later in 2014. Prior to Alma's incarceration, Alma chose her daughter, Melissa B., to care for Kyoko in her absence. Although Alma attempted to regain physical custody of Kyoko at the end of her 1-year term of incarceration, she learned that Melissa had been appointed as Kyoko's guardian requiring a transition. However, while awaiting the transition, Marcia's parents, Martin and Mary, were appointed as Kyoko's guardians.

After Marcia's release from incarceration in July 2016, Marcia commenced visitations with Kyoko and eventually filed to terminate the Martin and Mary's guardianship. After Marcia's release from incarceration and, until the time of the hearing, the Guardians allowed Kyoko, at times, to stay with foster parents; with the family of one of Kyoko's close personal friends; and with Alma. Eventually Kyoko resided with the Guardians in Gretna.

### 1. PRETRIAL

In October 2016, Marcia filed a petition to terminate Kyoko's guardianship with Martin and Mary. Trial in this matter was held in May 2018. Prior to the commencement of the trial, the court informed the parties that it intended to conduct an in camera interview of Kyoko. The court's explanation of the reason for the in camera interview and process to be followed was captured in the following colloquy between the court and Mr. McCann, attorney for the Guardians:

> THE COURT: . . . Number two, as it relates to my interview of the child, these are my rules as it relates to that interview. I will interview the child, but it will not be today. I'm going to allow the guardian ad litem, I'm going to allow the mother, and I'm going to

allow Mr. McCann to submit questions to me that you would like me to pose. The interview itself will not take place in front of any of the parties; not in front of the mother. The only party that will be available to the youngster is the guardian ad litem, who will arrange a time when she and I can visit. I reserve the right to use your questions. I'll choose those questions which I deem to be appropriate under the circumstances. That's my intention as it relates to the interview of the child. Any comments as it relates to that?

> MR. McCANN: My question would be, on the interview of the child, would there be a record made of that?

> THE COURT: I will absolutely be on -- it will be in front of my bailiff and -- it will be in the presence of my bailiff and I will arrange a time when the guardian ad litem can present the child to me to conduct that interview. But I will give each of the parties an opportunity -- and I'll make that determination after I hear the evidence as to when that will occur, and I will give everyone an appropriate amount of time to submit those questions.

> MR McCANN: So when you say the bailiff would be present, that means that --

> THE COURT: She will be recording. My bailiff here is my -- we do not have a court reporter. My bailiff will act as my court reporter and everything that I do, up to and including each and every question, will be on the record. So, in the event that [Marcia] or you, Mr. McCann, choose to appeal any decision I make, there will be a record of what the child told me under oath. It will be under oath, but it's been my experience over a long period of time that I will have a better opportunity to visit with her, in her position, without any pressure from the grandparents and from the mother . . . .

After admonishing the parties not to have any conversation with Kyoko about her testimony, and after clarifying the timing of the interview in relation to that, the following colloquy ensued:

> MR. McCANN: No questions about that. I understand the ruling of the Court. My clients understand the ruling of the Court. The question would be -- that did come up, I take it the order would be true as -- not only as to the parties, legal representatives --

> THE COURT: Correct.

> MR McCANN: -- and other witnesses to the case?

> THE COURT: No individual will be required -- and I will enter a specific order at the conclusion of this hearing today that no one will talk with Kyoko about this interview. And if I find that they did, I will hold a hearing to determine whether or not I'm going to find that individual in contempt for violating that order, and it will be clear when I'm finished here today.

The court then dictated an order consistent with the above-stated colloquy in the presence of the parties. Following that dictation, in response to the court's request to discuss any other preliminary matters, the following took place:

MR. McCANN: Your Honor, with respect to the court proceedings involving [Kyoko], may the parties and counsel be present in the hallways and at the courthouse in case --

THE COURT: No. No. No. The only person to be around is Kyoko and her guardian ad litem, period. Any other questions?

MR. McCANN: Nothing further.

Neither party, nor the guardian ad litem (GAL), objected to the court's stated process for interviewing Kyoko during the hearing or at trial.

2. TRIAL

Trial was held over 3 days in May 2018. The Guardians called Marcia, Martin, and Dr. Thomas Haley as witnesses. Marcia called herself as a witness along with Alma and Jessica Workman, Marcia's long-time acquaintance. Additionally, the court conducted an in camera interview of Kyoko with only the GAL present.

(a) Guardian's Witnesses

*(i) Marcia*

Marcia testified that, following her release from incarceration in 2016, she visited Kyoko whenever she could and attended Kyoko's parent-teacher conferences and track meets when she could and when she was not constrained by issues involving her 1-year-old child. She denied improperly supervising Kyoko or allowing her to use marijuana in her presence. Marcia testified that her relationship with Kyoko's foster parents was very good, the visitations were amicable, and that her visits with Kyoko were only strained when the Guardians were involved. While raising Kyoko, Marcia testified her relationship with the Guardians was strained. Marcia testified that she saw a counselor due to her relationship issues with the Guardians, and testified she had been diagnosed with PTSD, anxiety, and attention deficit disorder and she acknowledged taking medication for her medical conditions.

Marcia testified that, since her release from prison in 2016, she has worked to change her life so that she could be a responsible parent to Kyoko. In her own words, in response to a question governing whether she had a second child out-of-wedlock in order to reunify her with Kyoko, Marcia stated:

I wouldn't say - I was expecting to be reunited with Kyoko anyway, because all of my plans were to make good decisions and to be the strong mother that, you know, I have always tried to be. Obviously, I've made some mistakes. But, I mean, I took all of the classes they had in prison. I tried to make the best of it. I wanted to be the -- especially with -- she was always daddy's girl, but with her dad being in heaven, like, I know I had to step up even more, you know. But, like, I didn't have any -- I never thought this would be dragged out for years, like, I mean, the way it has been. Because I expected -- I planned fully to get out and make good choices, and I did. I got off parole. I passed my drug tests. Like, I was successful with everything and I thought I'd have her back within a couple of months. Like, I didn't know they'd stop [sic] fighting me. I mean, they're -- I mean, any -- I

- 4 -

don't really feel like they're my parents, because of the way they always treated me. But, like, I thought they'd be proud of me and I thought they'd support all the changes I'm trying to make in my life. I thought I'd have her back a long time ago, I mean.

In response to questions governing whether Marcia has made good decisions since her release from prison, Marcia stated she does not abuse her prescription medications and only takes medication as prescribed and coordinated by her team of doctors. She acknowledged living in numerous different residences relating back to periods prior to her incarceration but stated that she moved to improve her living conditions. Marcia acknowledged that her monthly income is limited to $1,500 in disability benefits that she receives due to her diagnosis of fibromyalgia along with government benefits she receives relating to her 1-year-old child and limited funds from some photography shoots in furtherance of her efforts to start her own photography business. In addition to the photography business that she acknowledged is slow in progressing, Marcia testified she is looking for other jobs in which she could more rapidly expand her portfolio.

Marcia testified that she named her photography business, "Midnight Reflections," and she intended to expand her business platform into web-based design, graphic design, and music production. Marcia denied being involved in prostitution and explained that she was issued a misdemeanor citation in 2012 after a conversation with an undercover officer which resulted in the charge. She stated that was a one-time issue and is not part of her current life or business. She also admitted that on or about the same time, she created the domain MidnightReflections@gmail.com and a GoDaddy account registered at Alma's address both of which advertised sexually explicit material, but she denied ever having a sex-related business, that the domains were designed at the request of an acquaintance, and that she removed the domains within two weeks of their creation. She stated that these were reflective of prior bad decisions, associating with the wrong people, and do not reflect who she is now or her intentions going forward.

Marcia testified that she lives at her current residence with her 1-year-old child. She stated that she and the child's father only dated a few times and were never married. She acknowledged that the father of her child is now incarcerated and she does not rely on him for support. She testified that she is financially capable of caring for her 1-year-old child and Kyoko and that she had a bedroom available for Kyoko when she returns to her care. She acknowledged having debt relating to her former education costs and medical bills, but that she has worked with credit counselors to establish payment arrangements which will clear up her credit. In sum, she testified that she has matured, has changed her lifestyle, and although she voluntarily agreed to the guardianship of Kyoko when she could not properly attend to her, she is now ready to resume her parenting role.

### (ii) Dr. Thomas Haley

Dr. Thomas Haley testified that he was retained by the Guardians pursuant to a motion and resulting court order. Dr. Haley testified to having performed a parental fitness examination of Marcia although the substance of the order requested him to perform a mental health examination.

Dr. Haley testified that he is a psychologist who has practiced as a counselor since 1973 and works with individual adults, children, families, and persons with disabilities.

Dr. Haley testified that he performed the evaluation of Marcia in October 2017. In connection with that evaluation, he reviewed Marcia's medical records supplied to him, Marcia's deposition testimony, and the report filed by the GAL. Dr. Haley also testified that he performed a series of psychology-based tests on Marcia along with a mental status examination.

After performing his examination of Marcia, Dr. Haley reported he had concerns with Marcia abusing prescription medications. He testified that Marcia was reluctant to participate in his evaluation and was quite nervous. He testified that, during her interview, Marcia minimized her alcohol use and abuse despite reporting she had been previously convicted of fourth offense DUI in 2014. Dr. Haley opined that Marcia appeared to have average to above average intelligence; was logical in her thought processes; her memory was intact; and her capacity for attention, concentration, and focus was intact. Dr. Haley reported that Marcia indicated that she had no social skills until age 20, that her parents abused her, and told her she had to tell others they were a happy family. She stated she was homeschooled and brainwashed by her parents. She stated she left home at 19 and finished a 2-year degree in juvenile perspectives at Iowa Western Community College in 2004 or 2005. According to Dr. Haley, the history furnished by Marcia was inconsistent with her record of receiving a GED while in prison between 2014 and 2016.

Dr. Haley opined that Marcia presents with "some very difficult mood disorder, thought disorder, and personality variables/difficulties that would impair her ability to carry out her parenting responsibilities." He stated that, because of her pathology, "through either resentment or difficulty with relationships or difficulty with the trust of others, her impulsivity, her lack of accepting responsibility, that all interferes with the expectations of parenting." Dr. Haley acknowledged there was no difficulty with Marcia currently raising her 1-year-old daughter to this point, but he opined that as her child grows, there will be difficulty in relation to encouraging development, expectations, setting limits, and teaching. Dr. Haley ultimately concluded that "[Marcia]'s unfit and unable to parent [Kyoko] because of ongoing addiction issues, and personality problems, and mood and impulse control problems."

Specifically, in relation to Dr. Haley's concerns of prescription medication abuse, he testified:

A. In terms of contact with mental health providers, the psychiatrists, other things, basically she's getting Adderall, Norco, atenolol, and Xanax, and is -- looks to be getting it from two or three separate physicians.

Q. What's the significance of that?

A. Well, it's to be able to abuse the drugs.

Q. You've reviewed Dr. Robert Cervantes (sic) records?

A. I did.

Q. And what did you find significant in those records?

A. Well, September 1st, the Adderall was started by Dr. Cervantes. And then she's also -- was seeing Dr. Julie Rothlisberger-Castillo and is getting Norco, atenolol, and Xanax from her. And the two doctors do not know about each other and she did not inform either physician of her history or the reason for her incarceration.

- 6 -

Q. So what is the significance of that finding and observation?

A. Well, again, it's to abuse the drugs.

On cross-examination, Marcia, who was not represented at the time of trial, engaged in the following colloquy with Dr. Haley:

Q. Well, did you -- I don't know what all records you had, but did you realize that all of CHI -- it's, like, the company that bought out Alegent. Do you realize they're all connected? Like, you might have a counselor here, a doctor here, a psychiatrist here. I mean, all -- everything is right there in the computer. Different doctors see you for different issues and different doctors prescribe medications. Did you realize they're all connected?

A. Yes.

### (iii) Martin S.

Martin testified that he and Mary moved to Gretna in August 2017 in order to enroll Kyoko in that school district. He testified that Marcia was their only child, that they have been involved with raising Kyoko from the beginning of her life, and have always seen her at least 2 to 3 days per week, they were very close with Kyoko's father when he was alive, and Martin did not believe that Marcia was capable of raising Kyoko. He testified that following Lawrence's death, Kyoko spent less time staying with Marcia which evolved into a guardianship with Alma in part because Marcia's dwelling was below livable standards. Martin then described certain episodes that occurred during that timeframe where Marcia was involved in problematic alcohol consumption and hallucinations and was eventually incarcerated for fourth offense drunk driving in 2014. He also testified that when Marcia left their home when she was 19, Marcia told her parents that she was afraid they were going to kill her. Martin testified that he and Mary attempted to get Marcia committed in Douglas County but there was not a bed available.

Martin testified he and Mary were supportive of Alma serving as the original guardian and that they assisted Alma in her guardianship role including encouraging counseling and they wanted that counseling to include Marcia. According to Martin, it was around that time that Kyoko became very agitated with Mary and him. Following Alma's incarceration, Martin testified that, at first, they allowed Kyoko's nomadic lifestyle and that Kyoko moved in with Melissa, but they later discovered Melissa may have been misusing Kyoko's Social Security income and that Kyoko was becoming increasingly mentally aggressive, including making increasing references to Martin and Mary being white as opposed to African-American. At this time, Martin and Mary decided they should take over as Kyoko's guardians. Martin testified that, when they obtained physical custody of Kyoko, Kyoko became "racist" and verbally aggressive toward them, including cursing at them. Kyoko told Martin and Mary that she hated them and now appeared to be a different child. By this time, there was a tension between Melissa and the Guardians and Martin believed Melissa presented safety concerns for Kyoko as she was surrounded by persons with criminal histories. However, the Guardians tried to combat this tension by encouraging Kyoko to stay with Alma.

Martin testified that he would like to restore his relationship with Marcia, but believes it will be difficult and he is not sure she desires to work on their relationship. He expressed concerns regarding restoring Alma as guardian including that Alma provides less structure for Kyoko in

relation to school work and her extracurricular activities than Mary and he provide. He testified that although some of Kyoko's grades have fallen over time with missed assignments, she obtains passing grades at school.

Martin testified that they received $630 per month in Social Security benefits for Kyoko's care which they spend on Kyoko's clothes, care, and cosmetics. He also testified that Kyoko is heavily involved in extracurricular activities and is scheduled to go on a 10-day school trip to Ecuador that summer. Martin testified that, in his opinion, it would be difficult for Kyoko to maintain her busy lifestyle if she was returned to Marcia's care.

Martin acknowledged that, although they served as guardians, they actually placed Kyoko in the home of a foster family on the advice of counselors. Martin explained that, because of the high amount of tension between Kyoko and the Guradians, counselors advised placing Kyoko in "some interim place where she could learn to de-racialize, where she could let the anger simmer down that she had against us." He testified they found Kyoko's foster family through Safe Families and that the foster family are good people who spend their own money on Kyoko and are close to her. He testified that "it grieves me that he had to find someone" because Kyoko had progressed to the point that she loathed them. That said, he testified their relationship now is good, that Kyoko has come to trust them, and she understands they were trying to help her.

Martin then testified Kyoko eventually moved from the foster home after Kyoko's GAL filed a motion stating Kyoko was stressed about her living arrangement and needed to be returned to Marcia. Following that filing, Martin testified that Marcia and Alma picked up Kyoko from the foster home to live with the family of her best friend where she resided for six weeks while the Guardians arranged to move to Gretna. At or about that time, Martin testified that he and Mary found, and read, Kyoko's diary which documented certain drug and sexual behaviors which heightened their concerns about Kyoko. Kyoko's diary was offered and received into evidence. Martin acknowledged that he discussed the matters with Kyoko and she now understands that she made a mistake and she chooses not to associate with people who use drugs. Martin testified that he believes Kyoko is more mature in her thinking and he believes her when she speaks with him. He testified that Kyoko now lives in Gretna, enjoys living there, is doing well, and her current lifestyle gives Kyoko her best chance to do well in life.

On cross-examination, many of Marcia's questions to Martin were stricken for making statements instead of asking questions, but one specific question posed, and Martin's response, was as follows:

> Q. Like, I guess I just want to know what, I mean, proof that you guys really have that -- right now that I can't take care of Kyoko? Or if, I mean, you think I'm so terrible, that Alma can't take care of Kyoko, or that we can't all work together? I mean, I just -- it's like you bring up -- why do you bring up stuff that is so old? What proof do you have right now? Like --
> THE COURT: Go ahead, sir.
> A. My understanding is, that's the point of the trial.

Following Martin's testimony, the Guardians rested.

### (b) Marcia's Witnesses

#### (i) Alma F. Testimony

Alma testified that when Guardians were appointed as Kyoko's guardians, the change caused stress for Kyoko because it eventually resulted in her moving to Gretna which caused difficulties in arranging visitation. Alma also testified that she had to teach Marcia social skills such as how to care for a baby and how to be self-sufficient; however, since Marcia was released from prison, Marcia has been a wonderful mother to her 1-year-old child making sure the child was properly fed, clothed, cared for, and providing her with appropriate medical care. Alma testified Marcia now lives in a nice home with a separate, clean, and decorated room for Kyoko, that Marcia has a strong bond with Kyoko, and Kyoko has indicated a great desire to return home to live with Marcia. She has observed Marcia now striving to obtain her goals in her life including pursuing her photography business and she has observed Marcia obtaining help and support in her life included regularly attending appointments with her psychiatrist and therapist. Alma testified that she had no concerns with Kyoko returning to live with Marcia or Marcia's ability to support Kyoko financially because Alma stated she would always be there to support and assist Marcia. She testified that she participated in weekend visitation with Kyoko since it was ordered by the court and attested that Marcia shared in that visitation.

On cross-examination, Alma testified that, in addition to helping Marcia, Alma has obtained guardianship of two other children whose mother has passed away. She testified that Marcia's photography business did not involve sex-related services. She testified she had no friction with Melissa in relation to the return of Kyoko when she was released from prison.

#### (ii) Jessica Workman

Workman testified that she first met Marcia 10 years ago in massage school and, throughout the years, they became close friends. She testified to the closeness of Marcia, Lawrence, and Kyoko prior to Lawrence's death and the time that Marcia and Kyoko have spent together. Workman testified that Marcia's current residence is well-equipped for Marcia's two children and that food and utilities are adequately provided. She also testified to the bond that has developed between Kyoko and her 1-year-old half sister. She also noted that, since Marcia's release from prison, Marcia has attempted to better herself and her lifestyle by working toward her photography business, regularly attending therapy sessions, and making plans for additional education. Finally, Workman testified that Marcia is a "good mom" to her children and had adequately provided for them.

On cross-examination, Workman testified that, in addition to her attempts to start her own photography business, Marcia has searched for additional employment but finding work was difficult because of her prior felony conviction. Workman acknowledged that since Marcia was released from prison nearly 2 years ago, she has only lived in Omaha for the last 3 months so her physical observations were limited to that period of time.

*(iii) Marcia S.*

Marcia offered into evidence, and the court received, certain photographs that were taken in connection with her photography business. She then reiterated to the court the difference in her life between the time she relinquished guardianship of Kyoko to Alma and went to prison, and the life she has pursued since her release. Those included her regular visits to therapy, her return to school, her pursuit of her photography business, and her search for other forms of employment. She testified that she learned about resources that are available to her and learned to access various forms of support. Marcia further testified that the home she now lives in is a clean and stable environment and she denied any present abuse of alcohol or drugs.

## (c) Kyoko's In Camera Testimony

During her in camera interview, Kyoko described how close she was with her father prior to his death. She described that she currently was a sophomore at Gretna High School and preferred to remain there. She testified that, at the beginning of the current school year, her grades were poor because she moved so often, did not care, and was not coping correctly. However, Kyoko testified that she pulled her grades up during the year and ultimately received a combination of A's, B's, and C's. She testified she likes her teachers, was involved in track and basketball, and was interested in learning multiple languages including sign language.

Kyoko testified that she loved her maternal grandparents, the Guardians, but did not fully trust them. She also testified that she loved Marcia. Kyoko stated that perhaps the greatest strain in her life was the inability of the people she loves to get along. She talked about her strong faith in God and said that when she encountered a problem, she would pray first, but she would probably not be comfortable with approaching the Guardians. Conversely, Kyoko testified she felt comfortable sharing anything with Marcia. She testified that she is aware that Marcia has had medical problems, but has never seen anything that appeared problematic other than Marcia seeming anxious at times and seeing Marcia suffering at times from pain caused by her fibromyalgia. She stated that Marcia is always trying to please everyone and not hurt anyone which, at times, places a strain on Marcia.

Kyoko testified that she almost never sees Marcia while at the Guardians' home because of their relationship impasse. Consequently, since she began living with the Guardians, she sees Marcia only on weekends when she spends time at Alma's home. Further, Kyoko is troubled by the fact that her visitation time with Marcia is limited due to the court-ordered supervision requirements in connection with that contact.

Kyoko again testified about her enjoyment of school and sports and desire to succeed at both. She had already begun thinking about career plans and testified to a desire to create stability for her own children so they do not have to deal the circumstances that she has faced. Kyoko testified about being a biracial child and wanted to make sure she remained close with both sides of her family. She believed her family dynamic was special and wanted to make sure it was preserved. When asked about her preference regarding her guardianship, Kyoko struggled noting she did not want to upset anyone and loved everyone involved, but she had grave concerns with her busy schedule and not seeing Marcia if the guardianship continued and she strongly believed she needed Marcia in her life.

Kyoko testified that Marcia's home provided her with good living accommodations. She believed that she Marcia needed each other and that, in contrast, the Guardians did not need her. She again testified to loving the Guardians and understanding that they cared for her, but strongly believed she needed Marcia to be more present in her life and wished there was no division among them.

### (d) Further Evidence

Neither party called the GAL as a witness, however, after both parties rested, the court asked whether either party objected to the court's receipt of the GAL's report. The Guardians' counsel objected on hearsay grounds and the GAL's report being beyond the scope of the trial. After the court expressed concern that Dr. Haley relied upon the GAL's report in issuing his opinions and that the court had received Dr. Haley's report including opinions into evidence, the Guardians' counsel then responded "Your honor, if there's a choice between Dr. Haley's report and opinions, and the guardian ad litem report going in, I'll withdraw the objection to the guardian ad litem's report." Following the withdrawal of that objection, the court received the GAL's report into evidence.

### 3. COUNTY COURT ORDER

Following the trial, the court issued a voluminous nineteen page order in which the court terminated the guardianship of Kyoko and denied the Guardians' requests to continue their appointment as coguardians. In that order, as relevant to this appeal, the court noted taking "sua sponte" notice of the pleadings in the file along with Neb. Rev. Stat. § 27-701 (Reissue 2016) and Neb. Rev. Stat. § 30-2616 (Reissue 2016); Neb. Ct. R. of Disc. § 6-332; and 25 U.S.C. § 1903. In doing so, the court stated, "Pursuant to Neb. Rev. Stat. § 27-201, the Court may judicially notice indisputable facts immediately ascertainable by reference to source of 'reasonably indisputable' accuracy." The court also made numerous "findings of fact and conclusions of law" in support of its order. The Guardians now appeal from that order.

### III. ASSIGNMENTS OF ERROR

The Guardians assign nineteen separate assignments of error. Revised and restated, those errors can be summarized and grouped into the following six categories: That the court erred (1) in its handling of the in camera interview of Kyoko; (2) in failing to include questions submitted to the court by the parties (to be considered by the court in conducting the in camera interview) as part of the transcript or supplemental transcripts; (3) in, sua sponte, taking judicial notice of the pleadings in the case without notice to the parties and providing the parties the right to respond; (4) in creating a record which contains reference to certain "indiscernible" responses throughout Kyoko's in camera interview; (5) in committing evidentiary errors in connection with the offer of certain exhibits and evidence; and (6) in numerous findings in the portion of the court's order entitled "findings of fact and conclusions of law" which resulted in error in its order terminating the guardianship.

## IV. STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code are reviewed for error on the record. *In re Guardianship of K.R.*, 26 Neb. App. 713, 923 N.W.2d 435 (2018). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court. *In re Guardianship of Aimee S.*, 26 Neb. App. 380, 920 N.W.2d 18 (2018).

## V. ANALYSIS

This is a proceeding by a biological parent, Marcia, to terminate a guardianship with respect to her then 15-year-old child Kyoko. The considerations of the trial court were concisely outlined by the Nebraska Supreme Court in *In re Guardianship of Robert D.*, 269 Neb. 820, 829, 696 N.W.2d 461, 469-70 (2005), wherein the court held:

> Under the parental preference principle, a parent's natural right to the custody of his or her child trumps the interests of strangers to the parent-child relationship and the preferences of the child. *In re Guardianship of D.J.,* 268 Neb. 239, 682 N.W.2d 238 (2004). Absent circumstances which terminate a parent's constitutionally protected right to care for his or her child, due regard for the right requires that a biological or adoptive parent be presumptively regarded as the proper guardian for his or her child. *Id.*
>
> Consequently, in guardianship termination proceedings involving a biological or adoptive parent, the parental preference principle serves to establish a rebuttable presumption that the best interests of the child are served by reuniting the minor child with his or her parent. *Id.* In other words, an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent either is unfit or has forfeited his or her right to custody. *Id.* Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent. *Id.*

"Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being." *In re Guardianship of Elizabeth H.*, 17 Neb. App. 752, 762, 771 N.W.2d 185, 193-94 (2009).

### 1. IN CAMERA INTERVIEW

The Guardians first argue that the court erred in its handling of the in camera interview of Kyoko. Specifically, the Guardians argue that the errors relate to not allowing parties to be present in the interview; that there was no information about the witness' testimony provided to the parties; that there was no information about what questions were or were not asked including, but not limited to, those questions submitted by the parties; that there was no chance to confront or cross-examine Kyoko; and that these errors constituted a violation of the Guardians' constitutional and statutory rights.

The requirements of due process in the circumstance where the State seeks to have a child testify in chambers at a juvenile adjudication hearing were outlined by the Nebraska Supreme Court in *In re Interest of Brian B. et al.*, 268 Neb. 870, 876, 689 N.W.2d 184, 190 (2004), wherein the court held:

> The State must first give notice of its intent to the parents of the juvenile or their counsel prior to the adjudication hearing. [*In re Interest of Danielle D. et al.,* 257 Neb. 198, 595 N.W.2d 544 (1999)]. When such notice is given, the juvenile court must conduct a hearing separate from the adjudication hearing to determine whether reasons exist for excluding the parents from the child's testimony at the adjudication hearing. *Id.* "A child should be allowed to testify in chambers at a separate hearing when there are legitimate concerns about the child's testifying in the presence of his or her parents," and it is "only logical that the child not be faced with the risk of being harmed when that is what the court is trying to prevent." *Id.* at 206, 595 N.W.2d at 550. When the requisite showing has been made by the State, the juvenile court may exercise its discretion in determining whether to permit the child to testify in chambers. *Id.*

Although this is not an adjudication and the State is not a party, the Nebraska Supreme Court has recognized that the fundamental liberty interest of parents in the care, custody, and management of their child is afforded due process protection. *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). Here, it is the Guardians, not the parents, who are asserting due process rights in this guardianship proceeding in relation to the in camera interview. But we do not need to expand upon the full scope of due process rights here in light of the guardians' failure to preserve this alleged error.

Here, in its order, the trial court referenced that the matter of the in camera interview was raised by Marcia's October 2017 motion titled "Motion for Encamera [sic] Interview of Minor Child." Further, prior to the commencement of the trial, the court held a hearing in which the court notified the parties of its intent to conduct an in camera interview of Kyoko and outlined the procedure to be followed which procedure is now the basis of the Guardians' assignment of error. Most notably, at no time during the pretrial hearing, nor at trial, did the Guardians, or any other party, object to the in camera interview or procedure the court intended, or did, utilize in conducting the in camera interview. The court subsequently conducted the interview in the exact manner which had been outlined during the pretrial hearing and properly made a record of the in camera interview.

As this court noted in *Kumke v. Kumke*, 11 Neb. App. 304, 310, 648 N.W.2d 797, 801 (2002), "Generally, where the parties have given consent or acquiescence to private interviews with the children and the court conducts an in camera hearing, such consent waives any objections which might be raised on appeal." Here, Marcia filed a motion requesting the in camera interview, the court held a pretrial hearing where it granted the request, and the court laid out the procedure that the court intended to follow in conducting the in camera interview. Neither party objected to that procedure. Under these circumstances, we treat the Guardians' conduct as an acquiescence to the in camera interview and the procedures to be employed, and, as Nebraska appellate courts have repeatedly stated, "a litigant's failure to make a timely objection waives the right to assert

- 13 -

prejudicial error on appeal." *In re Estate of Clinger*, 292 Neb. 237, 262, 872 N.W.2d 37, 55-56 (2015). Accord *In re Estate of Odenreider,* 286 Neb. 480, 837 N.W.2d 756 (2013); *In re Guardianship of Aimee S.*, 26 Neb. App. 380, 920 N.W.2d 18 (2018).

## 2. ERROR IN HANDLING REQUEST FOR SUPPLEMENTAL TRANSCRIPTS

The Guardians next argue that the court erred in its handling of their requests for supplemental transcripts. Specifically, the Guardians argue that the court erred by not including the questions submitted to the court by the parties (to be considered by the court in conducting the in camera interview) as part of the transcript or supplemental transcripts. The Guardians argue that they specifically included a request for the questions in a supplemental request for a transcript and that the court erred by failing to include those questions.

Neb. Ct. R. App. P. § 2-104 provides, in pertinent part:

(A) How Ordered; Contents.

(1) Upon filing the notice of appeal, the appellant shall file with the court from which the appeal is taken a praecipe directing the clerk to prepare a transcript, which shall contain:

(a) The pleadings upon which the case was tried, as designated by the appellant;

(b) The judgment, decree, or final order sought to be reversed, vacated, or modified, and the lower court's memorandum opinion, if any; and

(c) A copy of the supersedeas bond, if any, given in the district court, or, if none has been given, a recital of the fact that a bond for costs was given and approved in the district court, or a deposit made as required by Neb. Rev. Stat. § 25-1914.

(d) In cases where an application to proceed in forma pauperis has been filed, a copy of the order of the district court granting or denying such.

(2) If the appellant is of the opinion that other parts of the record are necessary for the proper presentation of the errors assigned in this court, he or she shall further direct the clerk to include in the transcript such additional parts of the record as he or she shall specify in the praecipe, including the instructions given by the trial court, if the appellant intends to assign error in the giving of any instruction, and any tendered instruction refused, if the appellant intends to assign error to such refusal. The appellant shall limit his or her request for such additional material to only those portions of the record which are material to the assignments of error.

(3) In filing a praecipe for transcript with the clerk of the district court, the party making such praecipe shall identify by name each specific document which the party desires to have included in the transcript pursuant to this rule. The clerk of the district court may not include, without specific written request, a copy of any document not required under this rule. The district court clerk shall, upon request, certify that the record does not contain a described document. The notice of appeal, praecipes for preparation of transcripts and bills of exceptions, and poverty affidavits shall not be included in the transcript, since they are previously certified and sent to this court.

- 14 -

Accordingly, if not a pleading, judgment, decree, order, bond, or order governing an application to proceed in forma pauperis, the Guardians were entitled to designate such other part of the record "[i]f the appellant is of the opinion that other parts of the record are necessary for the proper presentation of the errors assigned in this court." Neb. Ct. R. App. P. § 2-104(A)(2). Here, the questions requested were neither offered as exhibits during trial nor filed with the clerk of the court. For that reason, our court eventually granted a motion to compel filed by the Guardians governing the "questions" and allowed a followup hearing with the county court to determine whether the questions could or should be produced and whether they were, in fact, part of the record. Because the county court subsequently issued orders in connection with that hearing following the final order appealed here, that subsequent order is not part of this appeal and cannot be dealt with in a future appeal.

That said, in relation to this appeal, our record indicates that neither party marked, offered, or otherwise made these questions exhibits at trial. The record indicates the court invited these questions from the parties to consider in connection with its in camera interview of Kyoko. The court made clear on the record that it would review and consider asking the questions but that ultimately the court would decide what questions to pose to Kyoko. The court then made a complete record of the in camera interview so the parties knew exactly what questions were asked. The Guardians do not point to any specific question they suggest should have been asked but was not asked or otherwise explain how not having access to questions suggested by Marcia or the GAL and not asked resulted in prejudice to them. More importantly, as we stated above, the parties did not object to the court's description and subsequent conduction of the in camera interview including, but not limited to, the court's statement that only it would decide which questions to ask Kyoko.

Under these circumstances, we hold that the omission from the record of the questions posed by the parties for the court's consideration did not result in any prejudice to the Guardians as it relates to their specific assignment of error. Because the court was not obligated to obtain possible questions from the parties in the first instance, and because the court properly recorded the interview so that the questions that were asked of the child could be ascertained, the clerk of court's alleged failure to include potential questions for the court's consideration in the record was of no legal consequence.

### 3. JUDICIAL NOTICE

The Guardians next object to the court's reference in its order to, sua sponte, taking judicial notice of certain contents of the file and statutes listed therein. Specifically, the Guardians argue that, pursuant to Neb. Rev. Stat. § 27-201 (Reissue 2016), they were minimally entitled to notice of the court's intent to take judicial notice and should have been provided an opportunity to respond.

But the same issue of which the Guardians complain was resolved in *J.B. Contracting Servs. v. Universal Surety Co.*, 261 Neb. 586, 624 N.W.2d 13 (2001). There, the Nebraska Supreme Court stated:

> Judicial notice of adjudicative facts is governed by Neb. Evid. R. 201, Neb. Rev. Stat. § 27-201 (Reissue 1995). This rule authorizes a judge or court to "take judicial notice,

whether requested or not," and provides that "[j]udicial notice may be taken at any stage of the proceeding." § 27-201(3) and (6). In addition, the rule provides that "[a] party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken." § 27-201(5). The record does not reflect that [the Guardians] utilized this rule to challenge the propriety of taking judicial notice in the district court prior to perfecting this appeal. Assuming without deciding that the issue is nevertheless preserved for appeal, the record does not permit us to address it.

261 Neb. at 593, 624 N.W.2d at 19.

Similarly, the record before us demonstrates that the county court first took judicial notice of certain contents of the file and statutes in connection with its order. However, the record does not reflect that, prior to perfecting this appeal, the Guardians utilized this rule to challenge the propriety of taking judicial notice of the court's ruling which it could have done by motion. An appellate court will not consider an issue on appeal that was not passed upon by the trial court. *In re Interest of Sunshine A. et al.*, 258 Neb. 148, 602 N.W.2d 452 (1999). This assignment of error fails.

### 4. REFERENCES TO INDISCERNIBLE RESPONSES
### DURING IN CAMERA INTERVIEW

The Guardians next assign error to those portions of the bill of exceptions capturing the court's in camera interview of Kyoko where certain responses are referenced as "indiscernible." The Guardians argue that they should either be allowed to review the tape of the in camera interview or both parties should be provided affidavits governing the interpretation of missing fragments of the in camera interview, but that there needs to be a remedy for the inadequacy of the current record.

Neb. Ct. R. App. P. § 2-105(B)(5) provides the method by which a bill of exceptions may be amended. It provides:

The parties in the case may amend the bill of exceptions by written agreement to be attached to the bill of exceptions at any time prior to the time the case is submitted to the Supreme Court. Proposed amendments not agreed to by all the parties to the case shall be heard and decided by the district court after such notice as the court shall direct. The order of the district court thereon shall be attached to the bill of exceptions prior to the time the case is submitted to the Supreme Court. Hearings with respect to proposed amendments to a bill of exceptions may be held at chambers anywhere in the state. If the judge shall have ceased to hold office, or shall be prevented by disability from holding the hearing, or shall be absent from the state, such proposed amendments shall be heard by the successor judge, or by another district judge in the district, or by a district judge in an adjoining judicial district.

Pursuant to Neb. Ct. R. App. P. § 2-105(B)(9):

> These rules shall apply to all appeals and error proceedings where specific provision is not made by law for a bill of exceptions. Any court reporting personnel approved by the court, board, or tribunal from which the appeal or error proceedings is taken may attend and record the trial or proceedings and prepare a bill of exceptions, certified to be true and complete by such court reporting personnel, and file the same with the chief clerical officer of such court, board, or tribunal. Proposed amendments not agreed to shall be heard and determined by such court, board, or tribunal as provided in § 2-105(B)(5). The completed bill of exceptions shall be filed in the reviewing court within the time provided by law and, if no time be fixed, before the case is submitted to the reviewing court.

The Guardians made no attempt to amend the bill of exceptions in accordance with § 2-105(B)(5). They are, therefore, precluded from raising the issue regarding the insufficiency of the bill of exceptions on appeal. This assignment fails.

### 5. EVIDENTIARY ERRORS

#### (a) GAL's Report

The Guardians next object to the court's admission of the GAL's report into evidence. That admission was the subject of a conversation between the court and the Guardians' counsel as to the report's admissibility. During that conversation, the court expressed concerns that Dr. Haley relied on the GAL's report in connection with his opinions and, in response, the Guardians' counsel stated "Your honor, if there's a choice between Dr. Haley's report and opinions, and the guardian ad litem report going in, I'll withdraw the objection to the guardian ad litem's report."

The court never conditioned the admission of Dr. Haley's opinion on the admission of the GAL's report as counsel suggested. Instead, the court simply accepted counsel's retraction of his objection to the GAL's report. As we previously stated, "a litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal." *In re Estate of Clinger*, 292 Neb. 237, 262, 872 N.W.2d 37, 55-56 (2015). Accordingly, the Guardians' assignment of error in connection with the GAL's report fails.

#### (b) Evidence of Marcia's 2012 Conviction

The Guardians assign as error that the court erred in not allowing them to adduce evidence governing Marcia's 2012 misdemeanor conviction for soliciting prostitution. The court refused to allow evidence of the conviction citing Neb. Rev. Stat. § 27-609 (Reissue 2016).

Section 27-609 provides, in pertinent part:

> (1) For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which he was convicted or (b) involved dishonesty or false statement regardless of the punishment.

The court indicated that because the alleged incident that the Guardians sought to admit into evidence did not involve a crime contemplated by § 27-609(1)(a) or (b), the incident was not admissible. The Guardians argue that the alleged misdemeanor conviction for solicitation of prostitution was relevant to show Marcia's unfitness to parent Kyoko which was the issue in the proceeding and was other allowable under Neb. Rev. Stat. § 27-410 (Reissue 2016).

Section 27-410 provides:

> Evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal action, case, or proceeding against the person who made the plea or offer. This rule shall not apply to the introduction of voluntary and reliable statements made in court on the record in connection with any of the foregoing pleas or offers when offered for impeachment purposes or in a subsequent prosecution of the declarant for perjury or false statement.

We cannot discern how § 27-410 relates to the Guardians' argument that Marcia's prior 2012 misdemeanor conviction should have been allowed into evidence. That said, we agree with the Guardians that they were not offering evidence of the prior conviction to attack Marcia's credibility. They were offering the prior conviction as evidence of Marcia's fitness to parent Kyoko which we find to be relevant to the court's ultimate decision. Although the county court may be correct that evidence of Marcia's past conviction could not be admitted for purposes of credibility under § 27-609, it should have been admitted based on its relevance to the issue before the court. We hold the county court improperly excluded evidence of the 2012 misdemeanor conviction under § 27-609.

But this determination does not end our inquiry. To constitute reversible error in a civil case the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about such evidence admitted or excluded. *In re Estate of Brown-Elliot*, 27 Neb. App. 196, 930 N.W.2d 51 (2019). We hold that the exclusion of evidence of the 2012 misdemeanor conviction did not prejudice the Guardians in relation to the outcome of this case. As we explain more fully in the final portion of this opinion, there was significant evidence in the record that, from approximately the time frame of Lawrence's death in 2013 until Marcia's incarceration in 2014, Marcia was making poor decisions demonstrating a lack of fitness in relation to the ability to parent Kyoko. This was admittedly apparent even to Marcia who agreed to a guardianship for Kyoko on a temporary basis while Marcia attempted to change her life. After serving 2 years in prison and taking advantage of classes offered to her, Marcia clearly embarked upon a mission to change her lifestyle so as to regain custody of Kyoko. In short, this trial was not so much about who Marcia was in 2012, but more about who Marcia was in 2018. We further note that Marcia testified regarding her 2012 conviction and any further evidence regarding that conviction would have been cumulative. We hold that the court's exclusion of evidence of a 2012 conviction for misdemeanor solicitation of prostitution did not prejudice the Guardians in relation to the outcome of this case.

## (c) Other Evidentiary Errors

As their final assignment of evidentiary error, the Guardians cite the court's refusal to allow the Guardians to testify about former statements Kyoko's deceased father allegedly made to the Guardians about Marcia prior to his death in 2013 and the Guardians' attempts to report certain aspects of Marcia's prior mental health diagnoses. The Guardians allege that this evidence was improperly excluded due to improper objections by the GAL who was not entitled to object and the court's own sua sponte objection which he was not entitled to make. As to both, the Guardians' counsel failed to submit an offer of proof as to what the testimony on these subjects would have been. Without an offer of proof, the record is insufficient to review this issue. See *State v. Loving*, 27 Neb. App. 73, 95, 926 N.W.2d 686, 700-01 (2019) ("we conclude that our record is insufficient to review this issue, because during the trial, defense counsel failed to make an offer of proof as to what [the defendant] would have testified to had the court not sustained the State's objection").

## 6. INSUFFICIENCY OF EVIDENCE

The Guardians' final assignment of error is that there was insufficient evidence in the record to support a finding that the guardianship should not be terminated. The Guardians argue that (a) there was insufficient evidence in the record to support over 20 different findings of fact and conclusions of law in the court's order; (b) the court erred in stating that Kyoko needed to give her consent to the guardianship under § 30-2616; and (c) had the court considered the factors set forth in Neb. Rev. Stat. § 43-292 (Reissue 2016), the court would have concluded that termination of the guardianship was not warranted. We will consider these arguments independently.

## (a) Alleged Error Regarding Trial Court's Findings of Fact and Conclusions of Law

The Guardians contend that the trial court committed error in numerous findings in the portion of the court's order entitled "Findings of Fact and Conclusions of Law" which resulted in error in its order terminating the guardianship. It would, of course, be problematic if a specific finding of fact was not traceable to the record. That said, as it relates to this assignment, the ultimate issue is whether the record supports the county court's conclusion that the Guardians failed to establish by clear and convincing evidence that Marcia was presently unfit to parent Kyoko. We find that the county court did not err in finding that the Guardians failed to establish clear and convincing evidence of Marcia's current unfitness.

In arguing that termination of the guardianship was error, the Guardians focus on certain times in Marcia's life where she admittedly had struggled. Following Lawrence's death in 2013, Marcia appeared to have made numerous bad choices in connection with her personal life and in raising Kyoko. In fact, Marcia voluntarily chose a temporary guardianship for Kyoko in 2014 realizing that she was not in a position to parent Kyoko at that time. Marcia was incarcerated that year for fourth-offense DUI and, during her incarceration, she took classes to improve herself. Graciously, the Guardians stepped up to care for Kyoko during a difficult time in Marcia's life for which we commend them. We also recognize that the Guardians have sought to provide Kyoko with every advantage even going to the extent of moving to Gretna so that Kyoko would be able to attend school within that school district. We have no doubt of the Guardians' love and concern

for Kyoko and their belief that they can provide the best lifestyle for Kyoko. However, the question before this court is not whether the Guardians are fit guardians. Marcia, as Kyoko's mother, enjoys a rebuttable presumption that Kyoko's best interests are served by their reunion. See *In re Guardianship of Robert D.*, 269 Neb. 820, 696 N.W.2d 461 (2005). Accordingly, the issue before us is whether the trial court erred in determining that the Guardians had failed to meet their burden of proving by clear and convincing evidence that Marcia remained unfit or had forfeited her right to custody of Kyoko. See, *id.*; *In re Guardianship of D.J.*, 268 Neb. 239, 247, 682 N.W.2d 238, 245 (2004) (courts have "'never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide. . . . [T]he right shall be in the parent, unless the parent be affirmatively unfit. The statute does not make the judges the guardians of all the children in the state, with power to take them from their parents, so long as the latter discharge their duties to the best of their ability, and give them to strangers because such strangers may be better able to provide what is already well provided'").

As the Nebraska Supreme Court recently reiterated in In *In re Guardianship of K.R.*, 304 Neb. 1, 13, 932 N.W.2d 737, 745-46 (2019):

> The passage of time following the facts forming the basis of Heather's conviction affects the weight those facts can be given in an unfitness analysis. In *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011), we stated that evidence of unfitness must be focused upon a parent's *present* ability to care for a child. We added that evidence of a parent's past misdeeds may be pertinent, "insofar as [they] suggest[ ] present or future faults" and that "in some instances, [they] may be *very* pertinent." *Id.* at 594, 804 N.W.2d at 182 (emphasis in original).

Here, the record established that, after her release from incarceration in 2016, Marcia obtained a home in a clean and stable environment, returned to school, started a photography business, and has searched for additional employment. She also regularly attends therapy, takes her prescription medications, visits Kyoko, and takes care of her 1-year-old daughter. She further denies abuse of her current prescription medications and testified to only taking that which is prescribed by her team of physicians effectively refuting Dr. Haley's unsubstantiated claims to the contrary. In fact, the only significant evidence offered by the Guardians' governing Marcia's current lack of fitness came from the opinions of Dr. Haley. Dr. Haley, who was appointed by court order to conduct a mental health examination of Marcia, somehow ended up conducting a parental fitness examination. In doing so, Dr. Haley ultimately concluded that, although Marcia who was currently fit to raise her 1-year-old daughter, he did not believe her fit to attend to 15-year-old Kyoko due to continuing substance abuse issues with current prescription medication and certain mental health issues that would make it difficult for Marcia to carry out her parenting responsibilities.

First, Marcia adamantly denied substance abuse issues with prescription medications stating that she took medication for her conditions as prescribed by her team of physicians who had coordinated her care. The Guardians offered no rebuttal testimony or evidence to the contrary. Second, Dr. Haley's opinions made no reference to Marcia's ability to parent when seen and treated by competent professionals who Marcia testified she systematically follows and adheres to

again with no rebuttal evidence to the contrary. The Guardians did not call any of Marcia's current medical team that have coordinated her care and instead chose to rely on the testimony of Dr. Haley and his performance of a parental fitness examination. For these reasons and others, the county court found Dr. Haley's opinion to not be sufficiently reliable. We cannot say the court erred in so finding. As we have consistently stated, "the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child." *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 509, ___ N.W.2d ___, ___ (2019). Accordingly, this assigned error fails.

### (b) Kyoko's Consent to Guardianship

The Guardians also contend that the court erred in stating that Kyoko needed to give her consent to the guardianship under § 30-2616. When read in conjunction with the court's full statement on this issue, we find no error in the court's application of § 30-2616(c).

Section 30-2616(c) provides: "If, at any time in the proceeding, the court determines that the interests of the ward are, or may be, inadequately represented, it may appoint an attorney to represent the minor, giving consideration to the preference of the minor if the minor is fourteen or more years of age."

In its order, the county court stated that "[t]he Court interprets [§ 30-2616] to mean that at a minimum some deference should be given to Kyoko's wishes, especially as she grows older because in less than three (3) years, she will be able to choose where she lives." Thus, the county court found that some deference should be given to Kyoko's wishes, which is permitted by statute. Accordingly, the Guardians' claim to the contrary fails.

### (c) Factors Under § 43-292

Finally, the Guardians claim that had the court considered the factors set forth in § 43-292, the court would have concluded that termination of the guardianship was not warranted.

Section 43-292 specifies eleven independent statutory grounds upon which termination of parental rights may be sought. Specifically, in order for a court to terminate all parental rights between a parent and his or her child, the court must find by clear and convincing evidence that one or more of the eleven different statutory conditions exist and that termination is in the best interests of the child. The Nebraska Supreme court has additionally provided that although "[t]he term 'unfitness' is not expressly used in § 43-292, . . . the concept is generally encompassed by the fault and neglect subsections of that statute, and . . . through a determination of the children's best interests." *In re Interest of Nicole M.*, 287 Neb. 685, 704, 844 N.W.2d 65, 80 (2014).

That said, § 43-292 is specifically applicable to termination of parental rights matters and not guardianship matters. As we previously indicated in this opinion, for purposes of guardianship, parental unfitness means "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being." *In re Guardianship of Elizabeth H.*, 17 Neb. App. 752, 762, 771 N.W.2d 185, 193-94 (2009). As we stated in *In re Guardianship of Elizabeth H.*, "The 'fitness' standard applied in guardianship appointment under § 30-2608 is analogous to a juvenile court finding that it would be contrary to a juvenile's welfare

- 21 -

to return home." 17 Neb. App. at 762, 771 N.W.2d at 194. Thus, taken together, those subsections of § 43-292 generally encompassing the fault and neglect analysis provide guidance in analyzing a guardianship appointment proceeding, but are not necessarily dispositive. Here, the county court applied the correct standard of assessing "parental unfitness" and, as we stated above, did not err in concluding the Guardians did not establish by clear and convincing evidence that Marcia is currently unfit to parent Kyoko.

## VI. CONCLUSION

Having considered and found that the assignments of error raised by the Guardians fail, the county court's order terminating the guardianship of Kyoko is affirmed.

AFFIRMED.